**MONARCH ENTERTAINMENT BUREAU, INC., Plaintiff,**

v.

**NEW JERSEY HIGHWAY AUTHORITY and various John Does, Defendants.**

Civ. A. No. 88–3161.

United States District Court, D. New Jersey.

June 27, 1989.

---

Ansell Fox Zaro & McGovern by James M. McGovern, Jr., Jane M. Ryan, Eatontown, N.J., for plaintiff, Monarch Entertainment Bureau, Inc.

Robinson, Wayne & La Sala by Donald A. Robinson, Paul J. Linker, Timothy M. Donohue, Russell S. Burnside, Newark, N.J., for defendant, New Jersey Highway Authority.

DEBEVOISE, District Judge.

This is an antitrust action brought by an area entertainment promoter against the New Jersey Highway Authority and certain other presumably unknown defendants for violations of Section 1 of the Sherman Act, 15 U.S.C. sec. 1 and unspecified provisions of the Clayton Act, 15 U.S.C. sec. 12 *et seq.* The complaint alleges that the Authority managed its concert and cultural facility, the Garden States Art Center, in an anticompetitive fashion and conspired with competitors of the plaintiff to deny it access to this venue and to quash its plans to create an alternative open-air concert facility in the same relevant market. This matter comes before the court on a motion by the Authority to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted, or, in the alternative, for summary judgment based on the Authority's asserted immunity from federal antitrust provisions under the state-action doctrine.

*Background*

The New Jersey Highway Authority (the Authority or Highway Authority) was created in 1952 to "acquire, construct, maintain and operate" certain designated limited access express highways authorized by the legislature. N.J.S.A. sections 27:12B–5(e); 27:12B–3(d) (West Supp.1988). The Authority is established as a "body corporate and politic, with corporate succession." N.J.S.A. sec. 27:12B–4 (West Supp.1988). Its enabling legislation also declares that it is "constituted [as] an instrumentality exercising public and essential governmental functions, and the exercise by the authority of the powers conferred by this act in the construction, operation and maintenance of projects shall be deemed and held to be an essential governmental function of the State." *Id.* Among its powers, the Authority may sue and be sued in its own name, hold property, exercise the power of eminent domain, enter into contracts, float bonds, collect tolls and establish and enforce rules and regulations governing its highway projects. N.J.S.A. sec. 27:12B–5 (West Supp.1988).

The Authority is comprised of seven commissioners appointed by the governor with the advice and consent of the senate. N.J.S.A. sec. 27:12B–4 (West Supp.1988). The commissioners may be removed by the governor for cause. *Id.* The governor receives copies of the minutes of the Authority's meetings and "[n]o action taken by the Authority shall have force or effect until ten days ... after such copy of the minutes shall have been delivered or the approval thereof by the Governor prior thereto." *Id.* If the governor returns a copy of the minutes vetoing any action (except certain

actions pertaining to collective bargaining agreements) within ten days, "such action shall be null and of no effect." *Id.*

The Authority owns and operates the Garden State Parkway (the Parkway), one of the two major North–South arteries in the state. The Authority also owns and operates the Garden State Arts Center (the Arts Center or the Center) located on the grounds of Telegraph Hill Park alongside the Parkway in Holmdel. The Center is a roofed, open-air amphitheater which can accommodate an audience of over 10,000 in covered seating and on the adjoining lawn. The center offers concerts and other entertainment featuring a variety of popular and cultural artists for a paid admission fee in the late spring, summer, and early fall. The Authority's 1987 annual report indicates that a total audience of 419,207 ticketholders attended 65 "professional" evening performances with an average attendance of 6,314 per performance. The operations of the Center grossed over nine million dollars in 1987; of that sum ticket sales accounted for $8,314,184.

For the last five years, the Authority has retained the services of Ron Delsener and his company, Ardee Festivals, Inc. (Ardee), to book performances at the Center. In 1986, the Authority and Ardee entered into an agreement continuing this relationship through the 1990 season. This agreement provides that Ardee is to be compensated through the payment of a flat management fee, an incentive fee based on average paid attendance and, potentially, a percentage of any revenues gained from corporate sponsorship.

*The Present Action*

Plaintiff Monarch Entertainment Bureau, Inc. (Monarch) is a New Jersey corporation which describes itself as "involved in the scheduling and promotion of musical entertainment, comedic presentations, sporting events, and various other forms of entertainment," presumably in competition with Ardee. Its rather rambling complaint sets forth a number of allegations against the Authority.

At the outset, I note that the complaint never clearly defines the relevant product or service market (it suggests the "entertainment industry," but this is simply too broad) or the relevant geographic market involved. The complaint does allege that the Arts Center is a unique facility ("No facility with like characteristics and capacity is located within any reasonable radius of the [Arts Center]," para. 28). Because the Center is unique, Monarch alleges that it is "essential" that it have access to the facility if it is to compete in the New Jersey entertainment booking business; without the ability to book the Center, "entertainers who draw large crowds will be forced to terminate their relationship with a given promoter in favor of a promoter who has access to the facility in question in order that they can get 'booked' there." Para. 31.

Scattered throughout the complaint are a number of factual allegations which, although they are presented as if they were related to one claim, appear as if they might actually constitute separate counts. Monarch argues (1) that the Authority's exclusive agreements with a single promoter have prevented competition and constitute a per se antitrust violation (paras. 20–25), (2) that the Authority conspired with the John Doe defendants (presumably Ardee) to "restrain Plaintiff from producing shows [at the Center]" by entering the exclusive management agreements (para. 30) and (3) that the Authority conspired (with whom it is not specifically alleged) "to prohibit and influence governmental leaders and elected officials to stop Plaintiff" from gaining approval to build an alternative open-air amphitheater on the grounds of Liberty State Park in the City of Jersey City (paras. 42–46). Monarch also sets out an independent state-law claim that the Authority's method of awarding the exclusive management agreement with Ardee violated the New Jersey Open Public Meetings Act, N.J.S.A. sections 10:4–6 through 10:4–21, also known as the state "Sunshine Law."

The Authority seeks dismissal or summary judgment solely on the grounds of state action antitrust immunity and so, for purposes of the present motion only, I will put

aside what appear to be pleading deficiencies in Monarch's complaint and the very real question of whether Monarch has alleged a cognizable antitrust claim, even accepting its allegations as true.

*The State–Action Doctrine*

■ Almost fifty years ago, in the landmark case of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1942), the Supreme Court ruled that the Sherman Act was "not intended to restrain state action or official action directed by a state." *Id.* at 251, 63 S.Ct. at 313. At issue in that case was whether California's Agricultural Prorate Act, which restricted competition among raisin growers and maintained prices in the raisin distribution market, violated the Sherman Act. The Court's conclusion was grounded in principles of federalism and the absence of any clear indication in the Act's legislative history that it was meant to apply to the states.

> We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may subtract from their authority, an unexpressed purpose to nullify a state's control over it officers and agents is not lightly to be attributed to Congress.

*Id.* at 351, 63 S.Ct. at 313. The Court also concluded that "[t]here is no suggestion of a purpose to restrain state action in the Act's legislative history." *Id.* Further, although the state act required that the regulatory programs be approved by raisin producers, the Court found that "it is the state, acting through the Commission, which adopts the program and which enforces it with penal sanctions, in the execution of a governmental policy." *Id.* at 352, 63 S.Ct. at 314. The state "in adopting and enforcing the prorate program made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly but, as sovereign, imposed the restraint as an act of government

which the Sherman Act did not undertake to prohibit." *Id.* (citations omitted).

Since the time of *Parker*, the Court has had a variety of occasions to consider the application of the state action doctrine to municipalities and private parties acting under state authorization. In *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), a group of cities which owned and operated electric utility systems brought an antitrust claim against Louisiana Power & Light (LP & L). LP & L counterclaimed against the cities arguing that the city of Plaquemine's policy of contracting to provide gas and water service outside of its city limits only on condition that the customers buy electricity from the city constituted an illegal tying arrangement.

The Court rejected the cities' argument that they were entitled to unqualified antitrust immunity under the *Parker* doctrine.

> Cities are not themselves sovereign; they do not receive all the federal deference of the States that create them.... *Parker's* limitation of the exemption to 'official action directed by a state' ... is consistent with the fact that the State's subdivisions generally have not been treated as equivalents of the States themselves. In light of the serious economic dislocation which could result if cities were free to place their own parochial interests above the Nation's economic goals reflected in the antitrust laws ... we are especially unwilling to presume that Congress intended to exclude anticompetitive municipal action from their reach.

*Id.* at 412–13, 98 S.Ct. at 1136–37 (citations omitted). The *Lafayette* Court suggested, without deciding, that precedent indicated that municipalities must demonstrate that the "state policy requiring the anticompetitive restraint [on the part of the municipality] as part of a comprehensive regulatory scheme" must be, first, "clearly articulated and affirmatively expressed as state policy" and, second, "actively supervised" by the state. *Id.* at 410, 98 S.Ct. at 1135. The Supreme Court applied this test in *California Liquor Dealers Ass'n v. Midcal*

*Alum., Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), a case involving a challenge to private parties who established price restraints pursuant to a state-devised regulatory regime.

Although the relevant state agencies were not parties to the case, the Supreme Court applied the *Lafayette* test to agency action in determining whether private anticompetitive action was protected by the *Parker* doctrine in *Southern Motor Carriers Rate Conf. v. United States,* 471 U.S. 48, 62–63, 105 S.Ct. 1721, 1729–30, 85 L.Ed.2d 36 (1985).[1]

Two cases subsequent to *Lafayette* both modify and elucidate the "articulated state policy" prong of the state action doctrine. In *Community Communications Co. v. Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982) a private company, Community Communications Co. (CCC), had provided cable television services to one specific Boulder, Colorado neighborhood which was unable to receive normal television transmissions for geographic reasons. These cable services were limited, and consisted primarily of the transmission of television programming broadcast by regional commercial television stations. With the explosion of enhanced cable television services, however, CCC prepared to expand its services. The opportunities presented also attracted competitors who petitioned the City Council to enter the market.

In response to these petitions, the Boulder City Council declared a three-month moratorium on cable service expansion to permit it to draft a model ordinance and to halt CCC's expansion which it believed would discourage competition. CCC filed suit in federal district court, seeking a pre-liminary injunction, and arguing that the moratorium scheme was a violation of Section 1 of the Sherman Act. Boulder asserted the state action doctrine as a defense. It argued that the clear articulation standard of *Lafayette* was fulfilled by the Colorado Home Rule Amendment which vested in the state's municipalities "every power theretofore possessed by the legislature ... in local and municipal affairs." *Id.* at 52, 102 S.Ct. at 841. Boulder argued that the state " 'comprehended within the powers granted' " to Boulder the power to enact the cable moratorium and that the state thereby " 'contemplated' " Boulder's enactment of a regulatory program. *Id.* at 55, 102 S.Ct. at 842.

The Supreme Court rejected such an expansive reading of the Amendment. "The requirement of 'clear articulation and affirmative expression' is not satisfied when the State's position is one of mere *neutrality* respecting the municipal actions challenged as anticompetitive." *Id.* at 55, 102 S.Ct. at 842. (emphasis in original).

A State that allows its municipalities to do as they please can hardly be said to have 'contemplated' the specific anticompetitive actions for which municipal liability is sought. Nor can those actions be truly described as 'comprehended within the powers *granted,*' since the term, 'granted,' necessarily implies an affirmative addressing of the subject by the State. The State did not do so here: The relationship of the State of Colorado to Boulder's moratorium ordinance is one of precise neutrality.... Acceptance of such a proposition—that the general grant of power to enact ordinances necessarily implies state authorization to enact specific anticompetitive ordinances—

1. Obviously, state agencies do not stand in the same political relationship to the state as municipalities do. At some point, a state agency becomes so closely related to the state that it is the state itself and entitled to pure *Parker* immunity. *See, generally,* Areeda & Hovencamp, *Antitrust Law* para. 212.2 (Supp.1988) [the supplement to Areeda & Turner's multi-volume treatise, *Antitrust Law;* the treatise and 1988 supplement will be referred to hereinafter as Areeda & Turner]. This would be true in the case of state departments, for *example. See Charley's Taxi*

*Radio Dispatch Corp. v. SIDA of Hawaii, Inc.,* 810 F.2d 869 (9th Cir.1987). Although the Authority is "within" the State Department of Highways *and its actions are subject to veto* by the governor, it nonetheless has the qualities of an independent agency in, for example, its right to sue and be sued in its own name. Standard *Parker* immunity probably does not apply, therefore, and I will apply the *Lafayette* test, as modified by subsequent case law as discussed below.

would wholly eviscerate the concepts of 'clear articulation and affirmative expression' that our precedents require.

*Id.* at 55–56, 102 S.Ct. at 842–43 (emphasis in original).

The clear articulation standard was revisited three years later in *Hallie v. Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985). In *Hallie,* a number of unincorporated Wisconsin townships filed suit against the adjacent City of Eau Claire, alleging that its policies, like those challenged in *Lafayette,* constituted an illegal tying arrangement under the Sherman Act. Eau Claire had the only sewage treatment center in the relevant market and refused to provide access to this facility unless the outlying townships agreed through a referendum election to annexation by the city and agreed to use the city's sewage collection and transportation services. *Id.* at 37, 105 S.Ct. at 1715.

Eau Claire asserted immunity under the state action doctrine. It claimed that the clear articulation standard was satisfied by Wisconsin law which permitted cities to construct, add to, alter and repair sewage systems. *Id.* at 41, 105 S.Ct. at 1717. This authority included the power to " 'describe with reasonable particularity the district to be [served]' " and provided that " 'the municipal utility shall have no obligation to serve beyond the area so delineated.' " *Id.* The State Department of Natural Resources was empowered to require a city's sewage system to provide for hookups to other municipalities and areas upon condition that any unincorporated area agree to annexation by the city, although it had not so required in the case before the court. *Id.*

The Court ruled that this provision clearly satisfied the clear articulation requirement because they made anticompetitive restraints "foreseeable."

... the statutes clearly contemplate that a city may engage in anticompetitive conduct. Such conduct is a foreseeable result of empowering the City to refuse to serve unannexed areas. It is not necessary, as the Towns contend, for the state legislature to have stated explicitly that it expected that the City to engage in

conduct that would have anticompetitive effects. Applying the analysis of Lafayette it is sufficient that the statutes authorized the City to provide sewage services and also to determine the areas to be served. We think it is clear that anticompetitive effects *logically would result from this broad authority to regulate.* See New Motor Vehicle Bo. v. Orrin W. Fox Co., 439 U.S. 96, 109 [99 S.Ct. 403, 411, 58 L.Ed.2d 361] (1978) (no express intent to displace antitrust laws; but statute provided regulatory structure that inherently 'displaced unfettered business freedom.')

*Id.* 471 U.S. at 42, 105 S.Ct. at 1718 (emphasis added). In contrast to the regulatory scheme presented in *Boulder,* the Court noted, "the State has explicitly authorized Wisconsin cities to provide sewage services and has *delegated to the cities the express authority to take action that will foreseeably result in anticompetitive effects.* No reasonable argument can be made that these statutes are neutral in the same way that Colorado's Home Rule Amendment was." *Id.* at 43, 105 S.Ct. at 1718 (emphasis added). In conclusion, the Court ruled that the Wisconsin statutes "plainly show that 'the legislature contemplated the kind of action complained of,' " and that this was "sufficient to satisfy the clear articulation requirement of the state action test." *Id.* at 44, 105 S.Ct. at 1719 (citation omitted).

Thus precedent makes clear that the challenged anticompetitive acts, if not explicitly permitted by state law, must at the least be the foreseeable or logical result of the state policy that is relied upon as authority.

The state action doctrine's second requirement is that the anticompetitive actions be "actively supervised" by the state. *Hallie* summarily abandoned this requirement with respect to municipalities, *id.* at 46, 105 S.Ct. at 1719, and strongly suggested that the requirement should also be dropped with respect to state agencies: "In cases in which the actor is a state agency, it is likely that active state supervision would also not be required, although we do

not here decide that issue," *id.* at 46, n. 10, 105 S.Ct. at 1720 n. 10. The Authority argues that the Courts of Appeals for the Second and Eleventh Circuits, following the lead of the Supreme Court in *Hallie* and other cases, have clearly decided that this requirement need not be applied in this context. The Authority's position is persuasive. The active state supervision requirement is somewhat redundant in the context of state agencies since the requirement that the agency actions be the contemplated or foreseeable result of state policy ensures that the agency's actions are not ultra vires and since agencies, although they are subject to "capture" by parochial interest groups, presumably act in the public interest and are in any case subject to some form of state supervision. *See, generally,* I Areeda & Turner, para. 212.7 at pp. 142–43. I need not decide this issue, however, because it is clear that active state supervision of the Authority exists.

*Discussion*

■ The topic of parks and recreational areas is mentioned only fleetingly in the New Jersey Highway Authority Act. In the original version of the Act, " 'project' or 'highway project' means any express highway, superhighway or motorway ..."

> together with such adjoining park or recreational areas and facilities as the Authority, with the concurrence of the Department of Conservation and Economic Development, shall find to be necessary and desirable to promote the public health and welfare and feasible for development pursuant to this act....

N.J.S.A. sec. 27:12B-3(d) (West 1966).

Monarch argues that this rather sparse provision does not satisfy the clear articulation requirement. It contends that the main thrust of the statutory and regulatory scheme surrounding the Authority "is to facilitate motor vehicle traffic throughout the state, to coordinate 'feeder' roadways and to regulate restaurant facilities, rest stops and gas stations located adjacent to and/or abutting public highways in order to 'promote the public health and welfare' *insofar* as safe intrastate and interstate transportation is concerned." Monarch Brief at 9 (emphasis in original). Monarch argues that the Act does not articulate a policy to preempt competition in the market for entertainment promotion and booking and that such anticompetitive acts are not a foreseeable result of the state's limited grant of power to the Authority.

Were this 1952, when the Authority was created, or even 1967, the year before the Center was built, Monarch's argument would be persuasive. However, as a result of the controversy that surrounded the Authority's construction of the Center in 1968, the legislature ultimately amended the Highway Authority Act to permit the continued operation of the Center.

Some of the flavor of the legislative debate is captured in the testimony and remarks of legislators before the Autonomous Authorities Study Commission in 1968, a source that both Monarch and the Authority claim support their respective positions. The session is opened by the statement of then State Senator Matthew J. Rinaldo that was read into the record urging the necessity of a bill recently passed by the state senate curtailing the recreational project powers of the Authority. Senator Rinaldo conceded, however, that is was "too late" to do anything about the Arts Center then under construction. *See* Transcripts of the Public Hearings held before the Autonomous Authorities Study Commission on May 14, 1968 (hereinafter Study Commission Hearings), Vol. I at 1–3. While the Study Commission Hearings, held on May 14, June 19, and October 30, 1968, did provide a forum for some pointed questioning of Authority officials they also provided testimony by these officials that the Parkway project was intended to contain parks and recreational facilities and that the Arts Center project was true to this design. *E.g.,* Study Commission Hearings, Vol. III at 28–29 (October 1968 letter from then Governor Alfred Driscoll evincing the belief that the legislative leaders at the time of the passage of the New Jersey Highway Authority Act contemplated that the Parkway project would contain recreational areas, etc.).

Ultimately in 1968, the legislature enacted L.1968, c. 348, amending the Highway Authority Act and curtailing the Authority's power with respect to parks and recreational areas. Section 1 of this bill amended the relevant provisions of N.J.S.A. sec. 27:12B–3(d) to provide that:

> 'Project' or 'highway project' means any express highway, super highway or motor way ... together with such adjoining park or recreational areas and facilities *directly related to the use of the express highway, super highway, or motor way* as the authority with the concurrence of the Department of Conservation and Economic Development, shall find to be necessary and desirable *for the convenience and comfort of users of the highway project* and feasible for development pursuant to this act....

N.J.S.A. sec. 27:12B–3(d) (West Supp.1988) (amended provisions underlined). This law became effective on November 18, 1968.

Section 2 of this law provided that "[t]he [A]uthority shall not engage in construction or operation of any facility or activity not directly related to the use of a highway project except as may be specially provided under law," and became Section 5.1 of the New Jersey Highway Authority Act. N.J. S.A. sec. 27:12B–5.1 (West Supp.1988). Thus, L.1968, c. 348 could be viewed as the legislature's rebuke of the Authority for its expansive interpretation of its powers and for what the legislature apparently believed was its ultra vires act of constructing the Arts Center.

However the legislature did not force the Authority to abandon the Arts Center project. In fact, apparently to clarify the Center's uncertain status after the passage of the amendatory acts restricting the Authority's powers, the legislature enacted L.1968, c. 441, also in 1968. This act amended the new section 5.1 (added by c. 348) by adding one critical sentence: "The continued operation of existing facilities or activities by the [A]uthority shall not be affected by the provisions of this act." N.J.S.A. sec. 27:12B–5.1 (West Supp.1988).

The implications of the legislature's 1968 amendments to the Highway Authority Act are twofold. The legislature very clearly disapproved of the Authority's expansive interpretation of the provisions which the Authority believed authorized it to build an Arts Center. However, while ruling out the possibility of any future endeavors of a similar nature, the legislature explicitly approved the Authority's continued operation of the Arts Center.

Monarch concedes that "case law and a review of the enabling statute at issue might very likely result in [the Authority's] successful assertion of [state action] immunity were Plaintiff challenging anticompetitive actions regarding Garden State Parkway paving, towing and other contracts...." Monarch's Brief at 12. It contends that this case is different, however, because the challenged anticompetitive activities relate to the "entertainment industry" a topic on which the Highway Authority Act is entirely silent. Once it is clear that the legislature accepted and authorized the Authority's operation of the Arts Center, it becomes equally clear that an exclusive management contract providing for its operation is a foreseeable result of this power much as exclusive towing, service station and restaurant franchises are a foreseeable result of the Authority's responsibility for operating the Parkway itself.

The Authority concedes that "there was some question prior to 1968 whether [operation of the Arts Center] was one of the Highway Authority's responsibilities." Authority Reply Brief at 5, n. 2. It claims, however, that the amendment to the new section 5.1 countenanced the continued operation of the Arts Center by the Authority. Of course, the question of whether or not the legislature intended or ratified the Authority's construction and operation of the Arts Center is not the relevant inquiry. The question is whether the state policy contemplated the challenged anticompetitive acts or whether these acts were the foreseeable or logical result of the underlying state policy. If the Arts Center itself was not foreseeable, it is difficult to take the argument another step and to suggest that anticompetitive activities in the

management of the facility were contemplated or foreseeable as a result of the Authority's broad power to develop land adjoining the Parkway as parks and recreational areas.

The Authority also claims that the legislature was "specifically aware in 1968" that the Authority contracted, at that time, with one promoter to act as the exclusive booking agent for performances at the Art Center because then-Executive Director of the Authority D. Louis Tonti testified about this practice before the Study Commission on October 30, 1968:

> Q: ... Let's go into the operation of the Arts Center and let's talk about Nederlander Associates. Whey were they hired and who recommended them?
>
> A: Well the Authority Commissioners had a difficult policy decision before them some years ago on this project. The decision was whether to operate this Arts Center entirely within the staff of the Authority by setting up a special division, which incidentally I recommended, or by taking the other view which we have taken on other occasions, on other projects, of giving the whole matter over to an outside firm to carry out the managerial duties. This is not unlike the situation where we built millions of dollars worth of restaurants and gas stations and we turned them over to somebody else to operate—a very good analogy.
>
> . . . .
>
> Q: What was the actual agreement with the Nederlander Associates?
>
> . . . .
>
> A: ... In essence it says that they take over the full responsibility of booking, handling subscription [and?] ticket sales and general management of the Arts Center during the summer festival.

Study Commission Hearings, Vol. III at 44–45.

To argue that this provision, standing alone, demonstrates that the legislature specifically approved of the practice of granting exclusive management contracts proves too much. When viewed in the context of the amendment permitting continued operation of the Center, however, it is another factor that supports the view that agreements of this type are a foreseeable result of the state's policy.

It is clear that the use of exclusive management contracts for the operation of the Arts Center is a foreseeable result of the state policy explicitly authorizing the Authority's continued operation of the facility.

I need not linger long over the second prong of the state action doctrine, because it is clear that active state supervision exists. The governor is apprised of all Authority actions through the receipt of the Authority's minutes and has unfettered authority to veto any Authority action relating to the Arts Center. See N.J.S.A. sec. 27:12B–4 (West Supp.1988). The governor also appoints the Authority commissioners and ultimately has the power to remove them for good cause. *Id.* There can be no question but that adequate state supervision exists in this case.

*Monarch's Additional Arguments*

At oral argument, Monarch contended that in 1968 when the legislature adopted the amendment permitting the Authority's continued operation of the Center, the facility was open to other entertainment promoters. Although I did not conclude that this fact, if true, would be material, I permitted Monarch to submit affidavits in support of this contention and gave the Authority the opportunity to respond to any materials Monarch submitted.

In supplemental briefings, Monarch amplifies the arguments it made and urges the court to deny summary judgment to the Authority for two reasons. First, it argues that "most of the facts (and supporting documentation) essential to Plaintiff's proof of claim lie within the exclusive maintenance and control" of the Authority. January 19, 1989 Supplemental letter at 2. In support of this contention both Monarch's president, John Scher, and its counsel submit affidavits stating that documents relating to the relationship of the Authority and certain promoters have not been disclosed to Monarch.

Monarch's second ground is related to the evidence it expects to discover from the Authority. It argues, based on Scher's experience in the concert promotion business and his past dealings with the Authority, that there were three separate periods during the history of the Arts Center when concert promotion was managed in different ways. During the first period, from 1968 to 1978, the Authority contracted with Nederlander Arts Associates (Nederlander) to run the Center. Scher contends that the Nederlander agreement was essentially a rental agreement under which the promoter took full responsibility for all aspects of the event, from booking and ticket sales to promotion and production. Affidavit of John Scher, dated Jan. 24, 1989 (Scher Affidavit) at paras. 8–10. Monarch claims that the substance of this agreement is significant because it demonstrates that when the legislature enacted the 1968 amendment to the Authority Act permitting the continued operation of the Center, the Center was then running its concert promotion operations in a competitive manner. Monarch argues that in light of this, it cannot be concluded that the legislature envisioned that concert promotion would be managed anticompetitively or that noncompetitive bookings could be said to be a foreseeable result of the amendment.

Scher asserts that the Center's entertainment booking was done by an "in-house manager" during 1979 through 1980. Scher Affidavit at para. 10. Around this time Scher contends that the character of the entertainment industry started to change. Artists began to schedule concert tours exclusively at the growing number of amphitheater venues around the nation. Thus, Scher claims, Monarch was unable to work with artists it normally promoted during the summer months because it was unable to book the Center. Scher Affidavit at paras. 11, 12.

Scher characterizes as "anticompetitive" the manner in which the Center was run from 1981 to the present. During this time he claims that the Center prevented Monarch from building an alternative amphitheater facility and used its monopoly power to boost ticket prices. *Id.* at paras. 15,

16. The Authority also refused Monarch's offers to rent the facility, Scher asserts, although it allegedly rented the Center to others to show closed circuit boxing broadcasts. *Id.* at paras. 18, 19. Monarch contends that the Authority's inconsistent management practices demonstrate that the Center was run in an arbitrary fashion and that the management of the Center is "absolutely no symbol whatsoever of a 'state mandated policy' to affect (much less restrain) competition." Monarch Jan. 19th Brief at 2. Monarch also submits the affidavit of James Koplik, another entertainment booking agent, who, among other things, opines that the Nederlander agreement was for the services of a "promoter" which bore the entire risk of the acts, and not the services of a booking agent, like Ardee, which only schedules acts and leaves the running and staging of the productions to the Center.

The Authority vigorously disputes Monarch's characterization of the Nederlander contract. It points out that Monarch "has failed to produce (as promised [at oral argument]) *any* evidence that the [Center] was open to other promoters in 1968 or that Scher promoted any events at the facility." Authority Feb. 3 Supp. Brief at 3. As proof that the Nederlander agreement was exclusive, the Authority submits a copy of the agreement and the affidavit of Elizabeth McCann, Managing Director of Nederlander from 1966 through 1976. McCann states that during the course of Nederlander's agreement with the Center, "[n]o other performers were allowed to book performances at the Arts Center." Affidavit of Elizabeth McCann, dated June 3, 1989 at para. 4; *see also id.* at para. 5.

As the Authority notes, Monarch has not raised a material factual issue as to the manner in which the Center was managed in 1968 and before; as the uncontroverted McCann affidavit demonstrates, the Nederlander contract was, in practice if not in fact, an exclusive agreement. The question of how event booking was managed at the time of the 1968 amendment, however, while relevant to the issue of whether exclusive booking agent contracts were a

foreseeable result of the amendment, is not dispositive. Anticompetitive methods may be a foreseeable result of legislation even if, at the time of the legislation's enactment, the state instrumentality managed its facility competitively. Monarch points to nothing in the legislative history, assuming arguendo that the Authority managed the Center's entertainment booking in a competitive fashion in 1968, that indicates the legislature intended the permissive amendment to restrict the Authority's method of managing the facility.

There is one aspect of Scher's affidavit, however, that raises questions about the foreseeability of the impact of the allegedly anticompetitive manner in which the Center is booked. Scher argues that changes in the entertainment industry have effectively made the Center an "essential" facility to which competitors of Ardee must have access if they are to compete effectively with the Arts Center. This theory is better understood in the context of the "essential facilities" doctrine recognized recently by a growing number of courts.

*The Center as an Essential Facility*

■ The essential facilities doctrine is an antitrust theory gaining increasing currency in appellate opinions and in the literature. It attempts to address the situation where a monopolist controls a facility that its competitors need access to if they are to compete effectively. To prevail upon such a claim a plaintiff must establish:

> (1) control of the essential facility by a monopolist; (2) the competitor's inability practically or reasonably to duplicate the essential facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility.

*Flip Side Productions, Inc. v. Jam Productions, Ltd.,* 843 F.2d 1024, 1032 (7th Cir.1988), *quoting MCI Communications. Inc. v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1133 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). *See also Ferguson v. Greater Pocatello Chamber of Commerce, Inc.,* 848 F.2d 976, 983 (9th Cir.1988); *Interface Group, Inc. v. Massachusetts Port Authority,* 816 F.2d 9,

12 (1st Cir.1987); Areeda & Turner, paras. 736.2d; 736.2e (Supp.1988).

An "essential facility" is one which is not merely helpful but vital to the claimant's competitive viability. Areeda & Turner at para. 736.2b (Supp.1988). Areeda & Turner suggest that the doctrine should "at most" extend to "facilities that are a natural monopoly, facilities whose duplication is forbidden bylaw, and perhaps those that are publicly subsidized and thus could not practicably be built privately." *Id.* at pp. 680–81.

■ The basic thrust of Monarch's argument is that changing practices in the entertainment industry have made the Center an "essential facility" in the relevant market.

> In the late 1970s, a shift started toward a summer season of concert promotions centered around outdoor facilities such as the Garden State Arts Center. Similar open-air amphitheater facilities were built during this time period throughout the United States and various musical performers would plan a summer tour almost exclusively around outdoor amphitheaters. Therefore, only those promoters who had access to an outdoor amphitheater would be able to promote during the summer months and compete within the given marketplace. As more and more amphitheaters were built, an interesting phenomenon occurred: more and more artists geared their tours toward outdoor theaters and, as a result such facilities became more and more 'essential.'

Scher Affidavit at para. 12. Scher claims that the artists who had formerly worked with Monarch no longer booked through them since Monarch lacked entree to the required outdoor facilities. *Id.* Monarch cites the Beach Boys as an example. Monarch apparently handled this act for many years, but is now "unable to promote the Beach Boys during the summer months in New Jersey" because Monarch cannot book the facility.

It is very doubtful that the Center is an essential facility. Monarch does not allege that it can not book *any* concerts in the

summer months. Nor does it claim that there are no other amphitheater arenas in the state or that conventional facilities do not compete for summer concert goers with the Arts Center. It is difficult to make final judgments regarding this matter, however, when the market's character and geographic scope remain undefined. Monarch's conclusory allegations that the center is "essential" do not make it so; nor do its allegations that the Center is "unique" make it essential. Every facility is unique in some way; Monarch must show that it is vital if it is to compete in the relevant market.[2]

Even if it is assumed, however, that the Center is an essential facility, this does not save the action from dismissal. The essential facility doctrine is not an exception to the state-action doctrine. *See Interface Group, supra*, 816 F.2d at 12–13; *Driscoll v. New York*, 650 F.Supp. 1522, 1526–27 (S.D.N.Y.1987). In other words, even if the Center were an "essential facility" the Authority's actions would fail to give rise to a cause of action under the antitrust laws because the Authority enjoys *Parker* immunity.

The only way that Monarch could perhaps surmount the obstacle of the state-action doctrine is to argue that the Center's essentiality to the relevant market was not foreseeable at the time of the passage of the 1968 amendment, since the trend toward open-air summer concerts had not developed at that time. Thus, the argument goes, the impact of the anticompetitive management of such a facility could not have been foreseen—and therefore condoned—by the legislature. To create such an exception, however, would require the legislature to reiterate its approval of agency actions every time market conditions changed. The *Parker* test requires that the anticompetitive restraint employed by the state be a foreseeable result of the

enabling legislation; it would be a heavy burden indeed if a defendant agency had to demonstrate that changing market conditions that allegedly enhanced the market power of the agency were also foreseeable.[3] It would also strain the concept of foreseeability beyond reason if a legislature were required to "foresee" the evolution of sophisticated new antitrust doctrines that cast doubt on the use of particular anticompetitive restraints. It is enough that the use of anticompetitive restraints, in general, is a foreseeable result of the enabling legislation.

### The Alleged Conspiracy to Prevent Monarch's Construction of an Alternative Facility

■ Finally, I turn to Monarch's allegations that the Authority conspired, with others unnamed, to prevent it from building an outdoor entertainment facility in Liberty State Park in Jersey City. Monarch claims that it was involved in "extensive negotiations" with the City of Jersey City, the State Department of Environmental Protection and the State Division of Parks & Forestry "to erect a facility to produce and promote entertainment events during Spring and Summer months." Complaint para. 43, 44.

> In response to these negotiations, officials of the [Authority] did conspire and act in a concerted effort to prohibit and influence governmental leaders and elected officials to stop [Monarch] from accomplishing his [sic] objective of providing an alternative site for the promotion of outdoor events.

Complaint para. 45. As a result, Monarch alleges it was "precluded from obtaining approval" from the alternative facility and "has been prevented from engaging in competition with the Defendants [sic]." *Id.* at 46.

This allegation fails to state a cause of action. As the Supreme Court held, origi-

---

**2.** Although Monarch is, of course, permitted to plead in the alternative, the fact that it claims that but for the Authority's interference it would have built a $20 million alternative facility casts doubt on whether Monarch could ever show that it was impractical or unreasonable to duplicate the "essential facility."

**3.** In this particular situation, the somewhat discredited active state supervision requirement of the state-action doctrine has continuing viability. It ensures that the state is aware of agency actions and changing market conditions.

**1302**

nally in *Eastern R.R. Conference v. Noerr Motor Freight, Co.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and later in *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), "the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint of trade or a monopoly." *Noerr*, 365 U.S. at 136, 81 S.Ct. at 529.

In *Noerr*, a railroad industry association conducted a publicity campaign designed to influence the passage of state laws limiting truck weights, imposing higher taxes on heavy trucks and encouraging more rigid enforcement of state laws penalizing trucks for overweight loads and other traffic violations. The railroads and trucking companies, the Court recognized, are in competition for the heavy freight shipping business. A group of truckers brought an Action under Sections 1 and 2 of the Sherman Act and prevailed at trial. The Third Circuit affirmed the judgment.

In reversing, the Supreme Court distinguished between combinations in restraint of trade engaged in the use of price-fixing agreements, boycotts, market division agreements and the like on the one hand and collective efforts to persuade and influence the legislature. This result was grounded in two policies. First, the court observed that the legislative process was dependent on a free flow of information and open expression of opinion, even when advanced in self interest.

> In a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives. To hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which

would have no basis whatever in the legislative history of that Act.

*Noerr*, 365 U.S. at 137, 81 S.Ct. at 529.

Second, the Court concluded that restricting interactions with the government through use of the antitrust laws would raise important questions regarding the First Amendment right of petition. "The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." *Noerr*, 365 U.S. at 138, 81 S.Ct. at 530.

The Court noted, however, that not every attempt to petition the government is protected.

> There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified.

365 U.S. at 144, 81 S.Ct. at 533.

The application of the doctrine in this case raises an interesting question apparently of first impression: Would the extension of the Noerr doctrine to a state agency advance the doctrine's policies and the policies of the federal antitrust regime? A number of arguments can be marshalled against the application of the doctrine to state agencies. A state agency arguably stands in a different position to the government it seeks to influence than a citizen or a private corporation. As a creature of the government, a quasi-governmental entity like the Authority arguably enjoys greater access to and influence with state departments and offices. It might be argued that the antitrust laws should not be applicable to the state and its instrumentalities because the state lacks the motive to monopolize. But state agencies are, like corporations, organizations that develop their own norms and goals. An agency's organizational ethic may stray from the legislature's original intent and it is not inconceivable that an agency might seek to restrain or destroy private sector rivals that it perceives to threaten its mission.

Ultimately, however, *Noerr*'s first policy consideration, the government's need for access to information, remains relevant to quasi-governmental agencies. In the complex fabric of governance, there are a multiplicity of levels, agencies, departments and authorities, each with its own mandate and constituency. One office needs to hear what another has to say; one level of government must be free to obtain information from, as well as to persuade another. To mute the voices of state agencies through the threat of antitrust suits whenever the agencies counsel action that could have anticompetitive effects would impede the flow of significant information and interfere with an agency's legitimate efforts to advance its mission.[4]

Nor is a government agency necessarily a more "dangerous" actor that would require unhampered operation of the antitrust laws. It cannot be presumed that a quasi-governmental authority necessarily wields greater influence with state agencies and departments and with local governments. These entities are independent bodies with their own mandates and are subject to their own political pressures and interests. The competition and interaction between the various governmental entities also creates somewhat of a check on an overreaching agency.

Furthermore, there are non-governmental entities, a multinational corporation with a large presence in the state, for instance, that easily exercise more influence and enjoy greater access than certain state agencies. But the corporation would enjoy immunity under the *Noerr–Pennington* doctrine where the state agency would not. As to the *Noerr* doctrine's second policy ground, if first amendment petition rights extend to private corporations, it is not clear why they would also not extend to quasi-public corporations which enjoy some degree of independence from the state and have many of the rights of a private corporation.

Having determined that the *Noerr* doctrine should be extended to the Authority, it is clear that Monarch's complaint fails to state a cause of action. The complaint alleges merely that Monarch conspired with others to influence state departments and the City of Jersey City. On its face, this is activity protected by *Noerr*. Monarch fails to allege ostensible lobbying or petitioning activity that is not covered by *Noerr*. It does not, for example, allege that the Authority's efforts to influence the state and the city were a mere sham, *see* I Areeda & Turner at para. 203 (1978 & Supp.1988). Indeed, it would be difficult to defend this position when the Authority, if it did attempt to persuade the government entities involved, obtained the outcome it sought. There are other possible exceptions to the doctrine such as the use of improper means, such as bribery, to obtain the desired governmental action, *see* I Areeda & Turner at para. 204 (1978 & Supp. 1988) or conspiring with governmental officials to obtain anticompetitive results, *see* Areeda & Turner at para. 203.3 (Supp. 1988). But Monarch's complaint also fails to make these allegations. For these reasons, this count fails to state a cause of action and must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).[5]

*Conclusion*

For all of the reasons above, Monarch's antitrust claims are dismissed. Since the claims providing a basis for federal jurisdiction have been dismissed, the pendent state claims will be dismissed also. *See*

---

**4.** Nor does the fact that the Authority is alleged to have lobbied the executive branch of state government mean that the *Noerr* doctrine is inapplicable. "[T]he executive process remains diverse, complex, and subject to multiple sources of information and a variety of influences and pressures from interested parties, legislators, and others. Dealing with the executive branch is, in general, as much a rough and tumble process as dealing with the legislature." I Areeda & Turner, at para. 204 at pp. 47–48.

**5.** Monarch also requests, pursuant to Fed.R.Civ. P. 56(f), that the court refuse the Authority's application for summary judgment in order that it may have additional time to conduct discovery. Since Monarch has failed to make any allegations that would create exceptions to the various immunity doctrines discussed throughout the opinion above, however, the discovery of additional facts cannot aid its case and this request is therefore denied.

**1304**

*United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

The Authority is requested to submit an appropriate form of order.