### CYBER PROMOTIONS, INC.

v.

### AMERICA ONLINE, INC.

### AMERICA ONLINE, INC.

v.

### CYBER PROMOTIONS, INC.

C.A. Nos. 96–2486, 96–5213.

United States District Court,
E.D. Pennsylvania.

Nov. 26, 1996.

Michael A. Grow, Vorys, Sater, Seymour and Pease, Washington, DC, Ronald P. Schiller, Piper and Marbury, Philadelphia, PA, for plaintiff America Online, Inc.

Ralph A. Jacobs, Richard M. Bernstein, Hoyle, Morris & Kerr, Philadelphia, PA, Glenn S. Gitomer, McCausland, Keen & Buckman, Radnor, PA, Paul H. Kochanski, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, NJ, for defendant Cyber Promotions, Inc.

### MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

A mere two days after this Court ruled in a Memorandum Opinion and Order dated November 4, 1996 that Cyber Promotions, Inc. ("Cyber") does not have a right under the First Amendment to the United States Constitution or under the Constitutions of Pennsylvania and Virginia to send unsolicited e-mail advertisements over the Internet to subscribers of American Online, Inc. ("AOL"), Cyber filed a motion for leave to

amend its First Amended Complaint to assert an entirely different yet equally untenable theory which it claims gives it the right to use AOL's private property free of charge to send millions of e-mail advertisements to AOL subscribers—that AOL's blocking of Cyber's e-mail advertisements in favor of its own advertising violates the federal antitrust laws. Specifically, Cyber contends that AOL has obtained a monopoly in the market for providing direct marketing advertising material via electronic transmission to AOL's own subscribers in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Proposed Second Amended Complaint at ¶¶ 119–21. Not only has Cyber sought leave to file a Second Amended Complaint alleging its monopolization theory, it has also moved for injunctive relief in the form of a temporary restraining order on that claim. Cyber, however, has not cited nor has our research disclosed a single case which has granted a temporary restraining order in a Sherman Act case. In any event, after reviewing the parties' submissions and hearing oral argument by telephone, we will grant the motion to amend but deny the motion for a temporary restraining order.

The following are facts from our Memorandum Opinion and Order of November 4, 1996 which the parties have stipulated to and which provide background to Cyber's motion for a temporary restraining order.

1. AOL is a private online company that has invested substantial sums of its own money in equipment, name, software and reputation.

2. AOL's members or subscribers pay prescribed fees for use of AOL resources, access to AOL and access and use of AOL's e-mail system and its connection to the Internet.

3. AOL's e-mail system operates through dedicated computers known as servers, which consist of computer hardware and software purchased, maintained and owned by AOL. AOL's computer servers have a finite, though expandable, capacity to handle e-mail. All Internet e-mail from non-AOL members to AOL customers or members and from AOL customers or members to non-AOL members requires the use of AOL's computer hardware and software in combination with the hardware and software of the Internet and the hardware and software of the non-AOL members.

4. Private companies compete with AOL in the online business.

5. Although the Internet is accessible to all persons with just a computer, a modem and a service provider, the constituent parts of the Internet (namely the computer hardware and software, servers, service providers and related items) are owned and managed by private entities and persons, corporations, educational institutions and government entities, who cooperate to allow their constituent parts to be interconnected by a vast network of phone lines.

6. In order for non-AOL members to send Internet e-mail to AOL members, non-AOL members must utilize a combination of their own hardware and software, the Internet and AOL's network.

7. Cyber, an advertising agency incorporated in 1996, provides advertising services for companies and individuals wishing to advertise their products and services via e-mail.

8. Cyber sends its e-mail via the Internet to members of AOL, members of other commercial online services and other individuals with an Internet e-mail address.

9. AOL provides its subscribing members with one or more e-mail addresses so that members can exchange e-mail with one another and exchange e-mail (both sending and receiving) over the Internet with non-AOL members.

10. AOL attached to its Memorandum of Law in Support of its Motion for Partial Summary Judgment on First Amendment Issues three sets of examples of e-mail messages sent by Cyber to AOL members. The first set (Tab 1) consists of a multi-page set of advertisements; the second set (Tab 2) consists of an exclusive or single-advertiser e-mail; and the third set (Tab 3) consists of a document called by Cyber an "e-mag." Under each tab are two examples, the first selected by AOL and the second selected by Cyber. The Court has reviewed all of the examples and notes that many of the ads

include get-rich-quick ads, weight loss ads, health aid promises and even phone sex services.

In addition to the parties's factual stipulations, the following factual findings about the Internet itself made earlier this year by our court in *American Civil Liberties Union v. Reno,* 929 F.Supp. 824 (E.D.Pa.1996) are relevant:

11. The Internet is "a giant network which interconnects innumerable smaller groups of linked computer networks." *Id.* at 830. In short, it is "a global Web of linked networks and computers ..." *Id.* at 831.

12. "The Internet is an international system." *Id.* It is "a decentralized, global medium of communications—or 'cyberspace'— that links people, institutions, corporations, and governments around the world. This communications medium allows any of the literally tens of millions of people with access to the Internet to exchange information." *Id.*

13. "No single entity—academic, corporate, governmental, or non-profit—administers the Internet. It exists and functions as a result of the fact that hundreds of thousands of separate operators of computers and computer networks independently decided to use common data transfer protocol to exchange communications and information with other computers (which in turn exchange communications and information with still other computers)." *Id.* at 832.

14. Computer users have a wide variety of avenues by which to access the Internet. *Id.* One such avenue is "through one of the major national commercial 'online services' such as America Online, CompuServe, the Microsoft Network, or Prodigy. *Id.* at 833. These online services offer nationwide computer networks (so that subscribers can dial-in to a local telephone number), and the services provide extensive and well organized content within their own proprietary computer networks. In addition to allowing access to the extensive content available *within* each online service, the services also allow subscribers to link to the much larger resources of the Internet." *Id.* (emphasis in original). "The major commercial online services have almost twelve million individual subscribers across the United States." *Id.* Approximately seven million individuals are subscribers of AOL.

15. There are a number of different ways to communicate over the Internet. One such way "is via electronic mail, or 'e-mail', comparable in principle to sending a first class letter. One can address and transmit a message to one or more other people." *Id.* at 834.

The Court has also received an unrefuted affidavit from a UNIX Systems Administrator for AOL who avers:

16. From September 18 through October 21, 1996 AOL received from Cyber an average of 1.5 million e-mail messages per day.

17. From October 21, 1996 to the present, Cyber has continued to send to AOL members, on average, more than one million e-mail messages per day.

18. From November 4 through November 11, 1996, Cyber has sent to AOL members more than 1.9 million e-mail messages per day.

The motivation behind Cyber's assertion of its latest theory which it claims entitles it to send unsolicited e-mail advertisements over the Internet to subscribers of AOL appears to be AOL's implementation of a system "tool" which it calls "PreferredMail—The Guard Against Junk E–Mail". This "tool" allows access to Cyber's e-mail advertisements to those AOL subscribers who wish to receive these advertisements. Cyber objects to this tool because, according to Cyber, it places the onus on the AOL subscriber to take affirmative steps to *access* Cyber's e-mail by checking off a box on the screen captioned "I want junk e-mail!" and because it groups legitimate advertisers such as Cyber with pornographic advertisers thereby discouraging the subscriber to choose to receive Cyber's e-mail. Cyber likens "PreferredMail" to a "virtual black list" because it "contains the names of Internet advertisers who are responsible for sending the vast majority of unsolicited advertising through the Internet to AOL subscribers." Memorandum of Cyber in Support of Motion for Injunctive Relief at 3–4.

Cyber points out in its Memorandum that AOL does not automatically block its own unsolicited advertising which it transmits to its subscribers under the label "marketing 'pop-up' messages". Instead, it places the onus on its subscribers to *block* these messages by entering an area of AOL called "Marketing Preferences". The Marketing Preferences area advises AOL subscribers that AOL sells the right to target electronic advertising to its subscribers and sells the subscribers names to direct mail advertisers who use the U.S. Postal Service to send unsolicited advertisements. Cyber contends that the "striking distinctions between the means by which an AOL subscriber can receive or block unsolicited advertising from AOL and its competitors was intended by AOL to secure, and has in fact secured, AOL's monopoly in the market for providing targeted electronic advertising to its subscribers." Second Amended Complaint at ¶ 119. Cyber requests that we temporarily enjoin AOL from implementing its PreferredMail blocking tool, or from otherwise blocking system-wide, or interfering with, the electronic transmission of Cyber's advertising material sent to AOL subscribers.

■ The well-established factors we must consider when ruling on a motion for a temporary restraining order or preliminary injunction are (1) the likelihood that the applicant will prevail on the merits at a final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendants will suffer irreparable harm if the preliminary injunction is issued; (4) the public interest. *S & R Corp. v. Jiffy Lube Intern., Inc.*, 968 F.2d 371, 374 (3rd Cir. 1992). "All four factors should favor preliminary relief before the injunction will issue." *Id.* Because Cyber cannot satisfy the first factor—a likelihood of success on the merits at a final hearing—the motion for injunctive

relief in the form of a temporary restraining order must be denied.[1]

Cyber contends that the ability to advertise to AOL's subscribers over the Internet via electronic mail is an "essential facility" and that AOL has "refused to deal" with Cyber in violation of Section 2 of the Sherman Act. The irony of this contention is that AOL has *not* actually excluded Cyber from having access to AOL's system. Cyber is continuing to send its e-mail advertisements to AOL's servers. By implementing its PreferredMail system, AOL has given its own subscribers the option of viewing Cyber's e-mail without them having to pay to erase the e-mail every time they go online. Thus, Cyber is only being denied the access to AOL's system in a manner which *it prefers*, i.e., that AOL's customers should be able to view Cyber's e-mail without having to take affirmative steps to view the e-mail.

■ In any event, under the "essential facilities" or "bottleneck" doctrine, "a business or group of businesses which controls a scarce facility has an obligation to give competitors reasonable access to it." *Byars v. Bluff City News Co., Inc.*, 609 F.2d 843, 846, 856 & n. 34 (6th Cir.1980) citing *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945). Areeda & Turner caution that the doctrine should "at most" extend to "facilities that are a natural monopoly, facilities whose duplication is forbidden by law, and perhaps those that are publicly subsidized and thus could not practicably be built privately." P. Areeda & D. Turner, *Antitrust Law*, ¶ 736.2b at 680–81.

■ In order to make out a claim under the essential facilities doctrine, Cyber must show "(1) control of the essential facility by a monopolist; (2) the competitor's inability practically or reasonably to duplicate the essential facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility

---

1. As it has done in its previous motions for a temporary restraining order, Cyber continues to argue that unless a temporary restraining order is issued enjoining AOL from blocking Cyber's e-mail advertisements from reaching AOL's subscribers, AOL will go out of business. Despite the absence of any such orders, Cyber is not only

still very much in business but, as the Roach affidavit discloses, has actually increased the amount of e-mail advertisements it sends to AOL servers to 1.9 million per day. In short, Cyber will not be irreparably harmed in the absence of the temporary restraining order it seeks.

of providing the facility." *Ideal Dairy Farms,* 90 F.3d at 748.

▆ With regard to the first factor, there is little likelihood that Cyber will be able to demonstrate that AOL is a monopolist. In order to show AOL is a monopolist, Cyber must show that AOL possessed monopoly power in a relevant market and "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 749 (3rd Cir.1996). Monopoly power is the power to control prices and exclude competition with respect to a particular product and within a particular geographic market. *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1004–05, 100 L.Ed. 1264 (1956). The determination of a well-defined market, both geographically and by product, is essentially one of fact, turning on the unique market situation of each case. *Id.* at 394–95, 76 S.Ct. at 1006–08.

In its Second Amended Complaint, Cyber alleges the relevant market to be "the market for providing direct marketing advertising material via electronic transmission to AOL's subscribers". Second Amended Complaint at ¶¶ 114, 115, 120, 122. In its Reply Memorandum, Cyber defines the product market as the service of transmitting commercial advertising by electronic means to AOL's subscribers and defines the geographic market as AOL's subscribers themselves, a type of "electronic island to which AOL controls the only bridge". Reply Memorandum of Cyber Promotions, Inc. in Support of Motion for Temporary Restraining Order at 6. Even without the benefit of discovery or a hearing, the market as defined by Cyber

appears to us to be unrealistically narrow and tailored solely for Cyber's own purpose.

The first problem with Cyber's definition of the market is that AOL and Cyber are not competitors. Cyber alleges that Cyber and AOL are "*competitors* in the business of providing direct marketing advertising materials, via electronic transmission, to AOL's subscribers." Second Amended Complaint at ¶ 114 (emphasis added). Cyber repeats this allegation in its Memorandum by stating that "AOL and Cyber Promotions are head-to-head competitors in the market for transmitting direct marketing advertising materials to AOL's subscribers by electronic means." Memorandum in Support of Motion for Injunctive Relief at 10.

The record reveals, however, that AOL is not a business competitor of Cyber. AOL's business is that of a private commercial on-line service.[2] Cyber, on the other hand, is not in the business of providing commercial online service but instead is an advertising agency which provides advertising services for companies and individuals wishing to advertise their products and services via e-mail. Cyber's potential competitors are not the online systems whose customers it seeks to send its e-mail advertisements but rather other potential advertisers who also wish to provide direct marketing advertising materials via electronic mail to AOL subscribers.

Even if AOL and Cyber can somehow be viewed as "competitors" in the market for providing direct marketing advertising material via electronic transmission to AOL's subscribers, AOL has the right to control the advertisements which reach its own subscribers. After all these individuals became AOL subscribers by paying AOL a monthly fee. As is evident from the exhibits Cyber attaches to its Memorandum, AOL has no problem accepting advertisements from advertisers as long as these advertisers pay AOL and therefore provide AOL with a

2. Numerous other commercial online services including CompuServe, Prodigy and the Microsoft Network compete with AOL for the growing number of potential online customers. Indeed, an article about AOL in the October 31, 1996 edition of the Wall Street Journal which Cyber has attached to its Motion for Injunctive Relief as part of Exhibit H states that "AOL is besieged by

competition." As stated above, the parties have also stipulated that "[p]rivate companies compete with AOL in the online business." In fact, in order to keep up with its competition, AOL only recently announced that it was offering its subscribers a flat rate of $19.95 per month for unlimited access to AOL's electronic services as well as the Internet.

source of revenue. Cyber, however, refuses to pay AOL for sending approximately 1.9 million e-mail advertisements to AOL servers each day.[3] In short, the federal antitrust laws simply do not forbid AOL from excluding from its system advertisers like Cyber who refuse to pay AOL any fee (as opposed to those advertisers who do pay a fee) for their advertising on AOL's system. *See Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984) (a "business ... has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently.")

The problems with Cyber's market definition can best be revealed by the following analogy: Suppose that an advertising agency (Cyber) promises that for a fee it can get an advertiser's advertisements for get-rich-quick schemes, health aid promises and phone sex services in a daily newspaper or magazine for dissemination to that publication's subscribers without having to pay any fee to the publication. When the publication refuses to carry the ads, the advertising agency sues the publication claiming it has a monopoly over the market of advertising access to its own subscribers by means of the pages of its newspaper. The likelihood of success on such a theory would be slim indeed.

Even accepting Cyber's definition of the relevant market[4], in order to prove that AOL possesses monopoly power in this market, Cyber must show that AOL has the ability to charge advertisers supracompetitive prices for the right to advertise to AOL subscribers. Cyber has not, at least at this stage of the proceedings, made any showing that because AOL has restricted the manner in which Cyber may send its e-mail advertisements to AOL's subscribers, AOL has charged other potential advertisers supracompetitive prices for the right to advertise on its system or would desire to do so in the future. Indeed, it would be against AOL's economic best interests for it to even attempt to charge supracompetitive prices to advertisers on its system. As mentioned above, there are numerous commercial online services which compete for AOL's customer base, including CompuServe, the Microsoft Network and Prodigy. Were AOL to charge supracompetitive prices for advertising on its system, advertisers would only have to switch to any of these competing services or to other parts of the Internet such as the World Wide Web to disseminate their advertisements to online users. In short, AOL is not blocking the e-mail advertisements of a so-called competitor such as Cyber in order to charge supracompetitive prices but is blocking the Cyber's advertisements because Cyber is bombarding AOL's servers with up to 1.9 million e-mail advertisements per day without paying AOL a cent for the imposition.

■■■ There is one more problem with Cyber's definition of the market. Cyber correctly points out that the test for determining the relevant product market is one of "reasonable interchangeability". That is, "commodities reasonably interchangeable by consumers for the same purpose make up that 'part of the trade or commerce,' monopolization of which may be illegal." *Id.* 351 U.S. at 395, 76 S.Ct. at 1007. The key factor in determining whether certain products move in the same market is their cross-elasticity of demand, i.e. the degree that buyers of one product switch to the other in response to price changes. The higher the cross-elasticity of demand, the more buyers consider the two products substitutes for each other, and the more sensible it is to describe them as within the same market. *Id.* at 380–81, 76 S.Ct. at 998–99.

In the case *sub judice*, there are numerous competitive methods for advertisers such as Cyber to reach AOL subscribers including, but not limited to, the World Wide Web as

---

**3.** Thus, we find it ironic that Cyber states in its Reply Memorandum that "[t]he fact remains ... that AOL is the only 'game' in town'. Those who want to send commercial advertising material electronically to AOL's subscribers can either pay the freight or go elsewhere." Reply Memorandum of Cyber in Support of Motion for Temporary Restraining Order at 7. Cyber, of course, has never even offered to "pay the freight" to advertise on AOL's system.

**4.** As noted above, the definition of the relevant market is ultimately a question of fact which will have to be determined by a jury or a factfinder.

well as direct mail, billboards, television, newspapers and leaflets. AOL does not do business in these alternative advertising methods. If these additional advertising methods are ultimately found to be reasonably interchangeable with electronic mail and included as part of the relevant product market, AOL would not control a large enough percentage of the relevant product market to justify a finding of monopoly power.

Finally, even if Cyber could prove that AOL exercises monopoly power in a relevant market, there is little likelihood that Cyber will be able to show that AOL willfully acquired that power. On the contrary, AOL has throughout this litigation offered a number of legitimate business justifications for blocking Cyber's e-mail including the numerous complaints it has received from its subscribers, the technical burden the millions of e-mail advertisements cause on AOL's servers and the fact that Cyber does not pay AOL any fee whatsoever to carry Cyber's e-mail.

Even if Cyber could prove AOL is a monopolist in the relevant market, there is little likelihood that Cyber could prove that AOL monopolizes an "essential facility".

■ "An 'essential facility' is one which is not merely helpful but vital to the claimant's competitive viability." *Monarch Entertainment Bureau v. N.J. Highway Authority,* 715 F.Supp. 1290, 1300 (D.N.J.1989) (citing P. Areeda & D. Turner, *Antitrust Law,* ¶ 736.2b at 680–81 (Supp.1988)), *aff'd,* 893 F.2d 1331 (3d Cir.1989). The essential facility Cyber contends that AOL monopolizes is advertising to AOL's own subscribers via electronic mail. We believe there is little likelihood that Cyber will be able to show that the ability to advertise to AOL's subscribers is vital to Cyber's competitive ability.

In the first instance, as mentioned above, AOL has not even completely excluded Cyber from the AOL system. AOL's PreferredMail simply gives the AOL subscriber the option to choose whether he wishes to view Cyber's e-mail advertisements. In addition, AOL currently has approximately seven million members who constitute no more than one-sixth to one-seventh of the current total

e-mail population of 40 to 50 million and approximately one-half of the current total online population of 12 million. Cyber also has many other means of disseminating its advertising to Internet users in general and to AOL subscribers in particular besides electronic mail. Cyber can send its advertisements to the subscribers of the many other online services which compete with AOL, including CompuServe, the Microsoft Network and Prodigy. Cyber can send its advertisements to AOL members over the Internet through the World Wide Web which would allow access by AOL subscribers who want to receive Cyber's advertisements. Cyber, as an advertising agency, can disseminate its advertisements to AOL subscribers and others by non-Internet means including the United States mail, telemarketing, television, cable, newspapers, magazines, billboards and leaflets. And, of course, Cyber could attempt to lure AOL subscribers away from AOL by developing its own commercial online system or advertising web site and charging a competitive rate.

As a result, this case is not like the situation in *United States v. Terminal Railroad Association,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912) where the defendant railroads jointly owned the *only* feasible terminal for rail traffic coming to St. Louis from the west or the situation in *MCI Communications v. AT & T,* 708 F.2d 1081 (7th Cir.) *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983) where AT & T controlled access to the communications facility essential to operation of its competitor or the situation in *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.,* 738 F.2d 1509 (10th Cir. 1984) where the defendant ski operator controlled three of the four skiing mountains in the Aspen area and defendant refused to market a multi-day multi-mountain ticket with plaintiff leaving plaintiff unable to compete.

Instead, this case is much more similar to *Colonial Penn Group v. American Association of Retired Persons,* 698 F.Supp. 69 (E.D.Pa.1988). The defendant in *Colonial Penn* was a publisher of several magazines targeted to individuals in the over-fifty age group. Plaintiff was a provider of travel

services, homeowners and automobile insurance programs also targeted to individuals in the over-fifty age group. After endorsing plaintiff's services for a period of time in its publications, defendant decided to endorse only the services of plaintiff's rivals while at the same time excluding advertisements for plaintiff's services. Plaintiff brought an "essential facilities" claim, contending that advertising in defendant's publications is the only effective means to market its products to persons over the age of fifty in general and to defendant's members in particular. In reviewing plaintiff's definition of the relevant market as advertising access to defendant's members, the same market Cyber has defined here, this Court stated:

> Moreover, plaintiff, to show that [defendant] members comprise a discrete market segment, must show distinguishing characteristics of defendant members from the broader population of persons over the age of fifty. Merely defining the relevant market by the readership of defendant publications without further distinction is plainly insufficient and an exercise in circular reasoning; i.e., defining a market merely by a publications's readership begs the question of whether that publication is an essential facility.

*Colonial Penn,* 698 F.Supp. at 71, n. 1.

Although the Court ultimately denied the defendant's motion to dismiss with leave to renew in the form of a motion for summary judgment after discovery was completed, the reasoning of *Colonial Penn* is equally applicable to the case *sub judice.* Merely defining the relevant market as Cyber has done by the subscribership of AOL without further distinguishing AOL's subscribers from the other online subscribers or other Internet e-mail users to whom Cyber provides advertising services is also insufficient as such a definition begs the question of whether the subscribership of AOL is an essential facility. In short, Cyber has failed to show why its advertising to AOL subscribers is any more vital than its advertising to the subscribers of the many other commercial online services or its advertising to other individuals with an Internet e-mail address.

Even if Cyber could prove an essential facility, it is unlikely that it could satisfy the remaining elements of its essential facilities claim. With regard to the second factor— the competitor's inability practically or reasonably to duplicate the essential facility— Cyber has not shown any reason why it could not (other than perhaps because it would have to pay its own way) use its servers to create its own commercial online internet service or advertising web site and attempt to lure away AOL subscribers.

With regard to the third element—denial of the use of the essential facility to a competition—we reiterate that Cyber has *not* been completely prevented from sending its e-mail advertisements to AOL subscribers. Although the onus is on the AOL subscriber who wants to view Cyber's advertisements to click the "I want junk e-mail!" box on the screen, we do not believe this process is unreasonably burdensome to AOL subscribers.

Finally, Cyber is unlikely to be able to show the feasibility of AOL providing its facility to Cyber without the PreferredMail tool. It is clearly unfeasible for AOL's e-mail servers, which the parties have stipulated have a finite capacity, to be burdened with up to 1.9 million e-mail advertisements each day from a single advertiser such as Cyber. In addition, as we noted in our Memorandum Opinion of November 4, 1996, the Court has received a plethora of letters from disgruntled AOL subscribers who complain of not only having to sift through Cyber's e-mail advertisements in their e-mail boxes but also of having to pay for the time it takes to erase these messages. AOL simply should not have to incur the wrath of its paying customers and resulting damage to its reputation in order to carry millions of Cyber's e-mail advertisements free of charge.

In sum, we find that there is little likelihood that Cyber will be able to establish the necessary elements of its claim under the "essential facilities" or "bottleneck" doctrine and that AOL has "refused to deal" with Cyber in violation of Section 2 of the Sherman Act. As there is little likelihood that Cyber will prevail on the merits of its antitrust claim at a final hearing or that it will be

irreparably harmed in the absence of a temporary restraining order, its motion for injunctive relief in the form of a temporary restraining order must be denied.

*ORDER*

The motion of Cyber Promotions, Inc. to amend its Complaint is GRANTED. Cyber Promotions, Inc. is GRANTED leave to file and serve a Second Amended Complaint in the form appended to its motion.

The motion of Cyber Promotions, Inc. for injunctive relief in the form of a temporary restraining order is DENIED.

IT IS SO ORDERED.